IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 15-00083-05-CR-W-DGK |
| Benjamin H. McDaniel, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS (Doc. #83) filed on April 12, 2016 by defendant Benjamin H. McDaniel ("McDaniel"). On August 25, 2016, the undersigned held an evidentiary hearing on McDaniel's motion. McDaniel was present and represented by his counsel, Byron Woehlecke. The government was represented by Assistant United States Attorney Alison Dunning. At the evidentiary hearing, testimony was given by four witnesses: Special Agent Eric Immesberger with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Detective Aaron Gietzen and Sergeant Steve Boles both with the Independence, Missouri Police Department; and a lay witness, Rhonda Olf. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Photograph |
| Gov't. #2 | Consent to search form |
| Gov't. ##3-13 | Photographs |
| Gov't. #14 | Consent to search form |
| Gov't. #15 | Evidence log |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT[1]

1. Eric Immesberger is a Group Supervisor with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Tr. at 6.

2. Aaron Gietzen and Steve Boles are a detective and sergeant, respectively, in the Career Criminal Unit with the Independence, Missouri Police Department. Tr. at 77-78, 120-21.

3. On August 4, 2015, Special Agent Immesberger, Sgt. Boles, and Detective Gietzen were part of a year-long, multi-agency (federal and state) investigation into methamphetamine trafficking with McDaniel as one of the targets. Tr. at 10, 14, 79-80, 121, 123.

4. Prior to August 4, 2015, undercover officers had made controlled purchases of methamphetamine from McDaniel. Tr. at 10-11, 32, 57, 80.

5. Prior to August 4, 2015, undercover officers had also witnessed McDaniel using methamphetamine. Tr. at 11-12, 32.

6. Prior to August 4, 2015, investigators also had information that McDaniel possessed firearms. Tr. at 12.

7. Some of the undercover buys occurred at McDaniel's residence at 9707 Holmes Road in Kansas City. Tr. at 11.

8. Investigators obtained a federal search warrant for the Holmes address with the intent of serving it at 6:00 a.m. on August 4, 2015. Tr. at 13, 81.

9. In the early morning hours of August 4, 2015, investigators conducting pre-warrant surveillance observed McDaniel leave the Holmes residence and travel to a residence at 2831 Hawthorne in Kansas City. Tr. at 13, 54.

10. At 6:00 a.m., on August 4, 2015, several investigators conducted a search of McDaniel's Holmes address. Tr. at 53-54.

11. On August 4, 2015, at approximately 6:00 a.m., Special Agent Immesberger, Sgt. Boles, Detective Gietzen traveled to the residence at 2831 Hawthorne in Kansas City to conduct a "knock and talk" with the belief that McDaniel was at the residence. Tr. at 12, 14, 54, 57-58, 81-83, 121.

---

[1] In making these findings, the Court has been required to make some credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding the encounters with Ms. Olm and Ms. Olm's own testimony regarding the encounters. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concludes that, in general, where there were conflicts, the officers were more credible witnesses.

12. Special Agent Immesberger approached the front door, knocked, and announced that he was a police officer. Tr. at 16-17, 54, 56, 82, 122-23, 132.

13. All of the officers were dressed in uniforms and body armor identifying them as police. Tr. at 18, 86-87, 90, 146-47.

14. A woman – later identified as Rhonda Olf – answered the door and opened it all the way. Tr. at 18-19, 58.

15. Special Agent Immesberger identified himself and asked if McDaniel was there and Ms. Olf stepped back from the fully opened door and stated that McDaniel was in the bedroom. Tr. at 19, 33.

16. Ms. Olf then led Special Agent Immesberger to a door and said, "This is the bedroom." and from the open door Special Agent Immesberger could see McDaniel laying in a bed. Tr. at 19-20, 33, 58-60.

17. Special Agent Immesberger asked Ms. Olf not to enter the bedroom. Tr. at 21.

18. Special Agent Immesberger then entered the bedroom, identified himself, and escorted McDaniel to a living room in the residence. Tr. at 21, 23, 61, 149.

19. When Special Agent Immesberger entered the bedroom, he observed a revolver on a nightstand next to the bed. Tr. at 22.

20. McDaniel was only dressed in his underwear. Tr. at 21, 23, 60, 85.

21. Both Special Agent Immesberger and McDaniel took seats in the living room. Tr. at 23, 91.

22. Special Agent Immesberger informed McDaniel that he was under arrest for the sale of methamphetamine. Tr. at 23, 64, 68-69.

23. Special Agent Immesberger told McDaniel not to say anything while he explained that investigators were hoping to gain McDaniel's cooperation by participating in controlled deliveries of methamphetamine from his sources. Tr. at 24.

24. Special Agent Immesberger then verbally gave McDaniel his *Miranda* warnings. Tr. at 24-25, 63-64, 69-70, 91.

25. McDaniel informed Special Agent Immesberger that he did not wish to cooperate. Tr. at 25, 63-64.

26. Because McDaniel was sweating profusely, Special Agent Immesberger asked if he was on medication or high on methamphetamine. Tr. at 25.

27. McDaniel said that he was not on medication and had last used methamphetamine two days previously. Tr. at 25.

28. McDaniel was then allowed to get dressed and was transported to the Independence Police Department. Tr. at 25-26, 85.

29. Before allowing McDaniel to get dressed, for purposes of officer safety, Special Agent Immesberger went through his pants pockets and found $800 in currency and a key ring with keys which were removed from the pants. Tr. at 26, 85-86, 95.

30. After McDaniel was taken from the house, Special Agent Immesberger asked Ms. Olf if she would consent to a search of the house and explained that officers were conducting a narcotics and firearms investigation. Tr. at 31-32.

31. Ms. Olf was cooperative and verbally consented to a search and subsequently signed a written consent form. Tr. at 31-34, 36, 43-46, 65, 94-95, 102, 158; Gov't #2.

32. Ms. Olf was not threatened. Tr. at 66, 73-74, 92-93, 109, 126.

33. Ms. Olf told Special Agent Immesberger that the residence belonged to her. Tr. at 35-36, 94-95, 99, 142, 162.

34. Ms. Olf appeared be of average intelligence, to understand Special Agent Immesberger, and never objected to the search once it had begun. Tr. at 34-35, 96, 103, 127.

35. Ms. Olf is a high school graduate who was 56 at the time of the search of her residence. Tr. at 154.

36. Ms. Olf also told Special Agent Immesberger that there were weapons in her son's room. Tr. at 33-34.

37. Officers located two .22 caliber rifles in Ms. Olf's son's room. Tr. at 33-34.

38. Ms. Olf also told Special Agent Immesberger that she had known McDaniel since they were 10 years old and that he was staying over at her house 3-4 times a week. Tr. at 35, 131, 140.

39. The ensuing search of Ms. Olf's house uncovered a small amount of marijuana hidden under a mattress and a floor safe in the bedroom closet that belonged to Ms. Olf. Tr. at 36-37, 66-67, 99, 162.

40. The safe required both a dialed-in combination and a key to unlock. Tr. at 36, 164.

41. Ms. Olf had the combination written down on a piece of paper and she said that there was one key. Tr. at 36, 38, 67.

42. Although she kept items in the safe, Ms. Olf stated that McDaniel had recently put some items in the safe and he had the key. Tr. at 36, 38, 164.

43. Officers then tried the keys taken from McDaniel's pants and found that one of the keys turned the lock on the safe. Tr. at 36, 67, 102.

4

44. Officers then allowed Ms. Olf to enter the combination and open the safe. Tr. at 38, 101-02, 167-68.

45. Officers took items out of the safe and found jewelry, coins, personal paperwork as well as a quantity of 399 grams of methamphetamine, currency, two loaded handguns, and some marijuana. Tr. at 39-40, 97-101.

46. After the search was concluded, Ms. Olf agreed to drive herself to the police station to give a statement. Tr. at 53, 104, 166.

47. Ms. Olf came into the station and gave a voluntary statement to Detective Gietzen. Tr. at 104-05.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, McDaniel seeks to challenge the entry of officers into the Hawthorne residence, his warrantless arrest, and the search of the Hawthorne residence, including the floor safe.

As a preliminary matter, the Court has no difficulty in concluding that the officers had a sufficient basis to arrest McDaniel even without a warrant – if the entry into the Hawthorne residence was proper. In order to comply with the Fourth Amendment, a warrantless arrest must be "supported by probable cause." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). A law enforcement officer has probable cause "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the [arrestee] has committed or is committing an offense.' " *Id.* at 523 (*quoting Fisher v. Wal–Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). At the time of McDaniel's arrest, the arresting officer had knowledge and information that McDaniel had both used and sold an illegal drug – methamphetamine.[2]

---

[2] The fact that some of the information known to the arresting officer (Special Agent Immesberger) was not first-hand does not diminish probable cause. *See*, *e.g.*, *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) ("'[w]hen multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication'") (*quoting United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

5

However, absent some other justification, "[n]ot even probable cause . . . would permit an officer to enter [a] home without a warrant to make an arrest or seize contraband." *United States v. Wells*, 648 F.3d 671, 678 (8th Cir. 2011). Such a rule recognizes that the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. Without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment. *See*, *e.g.*, *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 2000). Those privacy interests are particularly enhanced when a search of an individual's domicile or residence is at issue. *See*, *e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097 (1984) ("It is axiomatic that the physical entry of the house is the chief evil which the wording of the Fourth Amendment is directed."). As protection for the citizen from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before undertaking a search of private property. *See*, *e.g.*, *Shade v. City of Farmington, Minnesota*, 309 F.3d 1054, 1059 (8th Cir. 2000).

As made clear in the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). In many search and seizure scenarios – particularly where a person's residence is involved – the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, law enforcement officers did not have a warrant to enter or search the Hawthorne residence. To that end, the Supreme Court has cautioned:

> [S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716 (2009) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514 (1967)). In the present case, the government seeks to justify the entry and search of the Hawthorne residence under an exception to the warrant requirement: consent. *Compare Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045 (1973) (warrantless search of a residence does not violate the Fourth Amendment if voluntary consent has been given by a resident).

Initially, it should be noted that the mere "knock and talk" approach itself utilized by officers did not even implicate the Fourth Amendment. The courts have recognized that "[a] 'knock-and-talk' is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1001 n.2 (8th Cir. 2010) (concluding that the technique is "reasonable and proper investigative strategy"). As recently summarized by another court:

> Courts have found implied consent (also referred to as an implied license) to enter curtilage pursuant to the "knock and talk" rule [and] no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways, for the purpose of making their presence known, making inquiries, or requesting consent to search. Such curtilage entry based on an implied license is only permissible when accompanied by a legitimate law enforcement objective. . . . The classic application of the knock and talk rule occurs when, for example, police enter a property through an unlocked gate and proceed up the driveway to the front door to request consent to search inside a home.

*Rozycki v. City of Champlin*, 2016 WL 7493619, op. at *9 (D. Minn. Dec. 30, 2016) (*citations omitted*). *See also Florida v. Jardines*, 133 S. Ct. 1409, 1423 (2013) (Alito, J., dissenting).

7

Case 4:15-cr-00083-DGK   Document 216   Filed 01/19/17   Page 7 of 11

However, once officers seek to enter a residence, the Fourth Amendment is implicated and officers must either have warrant, exigent circumstances, or consent. Only the latter is relevant to this case.

It is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 1803 (1991). In a typical consent-to-search case, the touchstone in analyzing a motion to suppress is whether the consent was voluntary. In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047-48. To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

(1) the defendant's age;

(2) the defendant's general intelligence and education;

(3) whether the defendant was under the influence of drugs or alcohol;

(4) whether the defendant was informed of his *Miranda* rights prior to consent; and

(5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding consent, courts will examine whether the person who consented:

(1) was detained and questioned for a long or short time;

(2) was threatened, physically intimidated, or punished by the police;

(3) relied upon promises or misrepresentations made by the police;

8

(4) was in custody or under arrest when the consent was given;

(5) was in a public or secluded place; or

(6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes that Rhonda Olf was an adult of seeming adequate intelligence and education.  There is no evidence that Ms. Olf was under the influence of any drugs or alcohol nor is there any evidence that she was threatened, physically intimidated, or punished by any officers.  Likewise, there is no indication in the record that officers made any promises or misrepresentations to Ms. Olf.  Ms. Olf was not in custody.

Under the facts of this case, however, the more central question is whether Ms. Olf's words and actions reasonable indicated her consent.  In this case, the Court finds that the credible testimony established that Ms. Olf completely opened the front door in response to the knocking, told the officers that McDaniel was in the bedroom, and then stepped back from the door (leaving it wide open) and <u>led</u> officers to the bedroom.  Under those circumstances (and attendant factual findings), the Court finds that Ms. Olf consented to the officers' entry into her domicile.

In the recent case of *United States v. Rodriguez*, 834 F.3d 937 (8th Cir. 2016), the Court was confronted with similar facts.  In *Rodriguez*, officers approached a suspect's residence to perform a "knock and talk."  *Id*. at 939.  After the suspect opened the front door, officers introduced themselves, said they had a "couple quick questions," and asked the suspect if they could "step in and talk real quick."  *Id*. at 939.  According to the court:

9

> [The suspect] did not verbally respond to [the officer's] comments,
> but immediately turned and entered the house. [The officers]
> followed him inside. [The suspect] did not say anything as they
> entered the house.

*Id*. at 940. Following his subsequent arrest, the suspect moved to suppress evidence obtained after the entry into his residence, arguing that the he had not consented. After the district court suppressed the evidence, an appeal was taken by the government.

On appeal, the Eighth Circuit reversed the suppression order. Viewing the officer's body camera, the court found:

> [B]ased on [the suspect's] behavior, the officers' belief he
> consented to their entry was objectively reasonable. Although [the
> suspect] did not affirmatively express consent to the officers' entry
> – either verbally or nonverbally – he also did not try to close the
> front door, or protest when [the officers] followed him into the
> house. Moreover, when [an officer] asked if he could step into the
> house to talk with [the suspect], [the suspect] immediately opened
> the screen door wider with one hand, and walked inside with his
> back to the officers. An objectively reasonable officer could
> interpret that series of actions as an invitation to enter.

*Id*. at 941. *See also United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010) (holding that when defendant "opened the door to the porch and stepped back, he impliedly invited the officers to enter"); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) ("[T]he action of [the defendant] in the opening of the door and stepping back constituted an implied invitation to enter."). Consistent with Eighth Circuit precedent, this Court also concludes that Ms. Olf impliedly invited officers to enter her residence.

Inasmuch as the Court finds the officers' entry into the Hawthorne residence was justified by the owner's consent and (as previously discussed) given that the officers had probable cause to arrest McDaniel, the Court does not find that the warrantless arrest of McDaniel violated the Constitution.

10

Ms. Olf's implied consent for officers to enter her residence and a full-scale search of the residence are two different matters. However, with regard to the latter, the Court concludes that officers obtained Ms. Olf's voluntary consent for the search (including the search of the safe) – and, in that instance, the consent was express and communicated verbally and confirmed in writing. The credible evidence establishes that Ms. Olf consented to the search voluntarily and of her own free will.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS (Doc. #83) filed on April 12, 2016 by defendant Benjamin H. McDaniel.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                              */s/ John T. Maughmer*
                                              **John T. Maughmer**
                                        **United States Magistrate Judge**